**Marc T. TAYLOR, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**Kevin Rasin, Defendant Below, Appellant,**

v.

**State of Delaware, Plaintiff Below, Appellee.**

**Nos. 293, 2012, 325, 2012.**

Supreme Court of Delaware.

Submitted: July 3, 2013.

Decided: Sept. 25, 2013.

52. *State v. Savage*, 2002 WL 187510, at *8 (Del.Super.Ct.2002).

53. *Id.* at *4–6.

54. *Id.* at *8

Michael C. Heyden, Esquire (argued), Wilmington, Delaware, for Appellant Marc T. Taylor.

James J. Haley, Jr., Esquire (argued), Ferrara & Haley, Wilmington, Delaware, for Appellant Kevin Rasin.

Maria T. Knoll, Esquire (argued), and Karen V. Sullivan, Esquire, Department of Justice, Wilmington, Delaware, for Appellee State of Delaware.

Before HOLLAND, BERGER, JACOBS and RIDGELY, Justices and NOBLE, Vice Chancellor,* constituting the Court en Banc.

BERGER, Justice:

In this appeal we consider, among other things, the constitutionality of Delaware's gang participation statute, 11 *Del. C.*

§ 616. Appellants argue that the statute is unconstitutionally vague because it does not define the term "actively participates." In addition, they say that the statute is overbroad because it impinges on the right of free association. Both arguments lack merit. A person of ordinary intelligence can understand what it means to actively participate in a criminal street gang's criminal conduct, and there is no constitutional right to assemble for the purpose of committing a crime. Appellants' remaining claims, about evidentiary rulings and the trial court's denial of a motion to sever, also fail. Accordingly, we affirm.

**Factual and Procedural Background**

This appeal involves a number of crimes, including murders, attempted murders, assaults, and weapons charges, stemming from a dispute between two rival gangs in Wilmington, Delaware. One is a group of men who grew up together and are members of a rap group named the "TrapStars." Appellants Marc Taylor and Kevin Rasin are TrapStar members, as are Kevin Fayson, Terrance Mills, Darnell Flowers, Jeroy Ellis and Quincey Thomas. Robert Valentine and Terry Smith are known associates of the TrapStars. Initially, the TrapStars performed for street audiences and posted rap videos on YouTube wearing black hooded sweatshirts depicting their TrapStars logo. By 2008, the TrapStars had become a criminal street gang and sold drugs to finance their music-related endeavors. The rival gang, called "Pope's Group," also sold drugs and engaged in other illegal activities in West Wilmington. Pope's Group is a subset of the Latin Kings. The members of Pope's Group are Jose Charriez, Tyaire Brooks, Carlos Rodriguez, Carlos Rosa, David Hill, Carlos Callazo, Marcus Crawford, and Alvan

---

* Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a) to fill up the quorum as required.

Butcher. Jason Ortiz and Marco Cruz are Latin Kings.

In December 2009, the two gangs started fighting. Brooks and Rodriguez burglarized Nakevis Walker's house, known as the "Trap House," which was the place where the TrapStars stored firearms, money, and drugs. Brooks and Rodriguez stole from the TrapStars because Mills owed them drug money. A few weeks later, Mills, his mother, and Ellis, confronted Brooks and Rodriguez on the street. That fight ended when Hill fired a gun into the air. Three weeks later, Mills started another fight, this time with Rosa. Ellis, Brooks, and Hill were present, and the fight ended when Hill took Mills' gun and aimed it at Mills.

The fighting escalated in February 2010, when Fayson and a Latin King gang member were involved in a drug deal that culminated in the murder of Anthony Doyle. Hill was related to Doyle. A few days after Doyle's murder, Hill shot at Fayson in front of a Metro PCS store. On April 3, 2010, Brooks, Hill, Charriez and Rosa went to Mills' house. Hill shot through Mills' front door, almost hitting Mills' sister. The police arrested Charriez and Hill.

The next day, the TrapStars, including Rasin and Taylor, met at Fayson's house to plot revenge. They agreed to post lookouts with weapons in the area of Franklin and 3rd Street. On April 5, 2010, Rodriguez and Brooks became suspicious when they noticed Mills and Thomas in a car, circling the block. One of the two Pope's Group members contacted Butcher, who joined them, and gave Rodriguez a gun. During the gun battle that followed, Butcher was killed. The next day, someone set Ellis's car on fire. After Butcher's murder, the war between the two gangs intensified. Pope's Group members were instructed to shoot TrapStars "on sight." On April 30, 2010, Fayson, accompanied by Rasin, and armed with a gun allegedly procured through Taylor, repeatedly shot at Jazzmon Smith and Kenneth Swanson, who were in a maroon colored car. Rasin and Fayson then fled in Rasin's Pontiac. Fayson gave the gun to Rasin.

On May 3, 2010, Crawford and Charriez were driving down Adams Street. When they stopped at a red light, Rasin ran into the street behind their car and started shooting at them. Charriez was shot in the head and killed. At the time of the shooting, Taylor, Valentine, and Fayson were with Rasin at the intersection where Charriez was killed. Rasin gave Taylor the murder weapon to clean and reload.

On May 6, 2010, Taylor was shot while walking in the 800 block of North Adams Street. Taylor survived the shooting and ran into a nearby apartment. When the police arrived at the scene, they traced Taylor's steps, and found a handgun in the apartment. That gun was later connected to previous homicides. On May 15, 2010, Taylor thought Larry Whye, a person he did not know, was following him. Taylor shot Whye in the hand. Whye apparently was unaffiliated with either the TrapStars or Pope's Group.

Taylor was arrested on August 10, 2010, and indicted on 11 felony counts, including gang participation, second degree conspiracy, possession of a firearm by a person prohibited, second degree assault, possession with intent to deliver, and resisting arrest. Rasin was arrested on September 17, 2010, and indicted on 14 felony counts, including gang participation, two counts of first degree murder, two counts of attempted murder, second degree conspiracy, and possession of a firearm during the commission of a felony. Six other TrapStars co-defendants pled guilty. Rasin and Taylor went to trial. Rasin was acquitted on one count of attempted murder and one count of possession of a firearm during the commission of a felony. He was convicted

on all other charges. Taylor was acquitted on the charges of conspiracy, resisting arrest, and possession with intent to deliver, but was found guilty on the lesser included offense of simple possession. Taylor was found guilty on all remaining counts. These appeals followed.

## Discussion

### I. Gang Participation Statute

In 2003, Delaware established the felony of "illegal gang participation," codified at 11 *Del. C.* § 616, which provides as follows:

(b) Forbidden conduct—A person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and who knowingly promotes, furthers or assists in any criminal conduct by members of that gang which would constitute a felony under Delaware law, shall be guilty of illegal gang participation. Illegal gang participation is a class F felony.

Section 616(a) defines "criminal street gang" and "pattern of criminal gang activity":

(1) "Criminal street gang" means any ongoing organization, association, or group of 3 or more persons, whether formal or informal, having as 1 of its primary activities the commission of one or more of the criminal acts enumerated in paragraph (a)(2) of this section, having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.

(2) "Pattern of criminal gang activity" means the commission of attempted commission of, conspiracy to commit, solicitation of, or conviction of 2 or more of the following criminal offenses, provided at least 1 of these offenses occurred after July 1, 2003, and that the last of those offenses occurred within 3 years after a prior offense, and provided that the offenses were committed on separate occasions, or by 2 or more persons:

a. Assault, as defined in § 612 or § 613 of this title.

b. Any criminal acts causing death as defined in §§ 632–636 of this title.

c. Any criminal acts relating to sexual offenses defined in §§ 768–780 of this title....

 Both Taylor and Rasin challenge the constitutionality of the gang participation statute on the ground that it is vague and overbroad. They argue that the statute is vague because the term "actively participates," is not defined, and because the statute provides no guidance as to the type of behavior a person must engage in to move from "passive" to "active" participation. Taylor also contends that § 616 is unconstitutionally vague because the statute's definition of "pattern of criminal activity" is at odds with its definition of "forbidden conduct." Taylor and Rasin argue that § 616 is overbroad because it limits freedom of association without a compelling need to do so. Challenges to the constitutionality of a statute are reviewed *de novo*.[1]

### Vagueness Challenge

 As with all legislative enactments, the gang participation statute is presumed to be constitutional.[2] "A statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated behavior is forbidden [or] if it encourages arbitrary or erratic enforcement."[3] Taylor and Rasin argue

---

1. *Thomas v. State*, 725 A.2d 424, 427 (Del. 1999).

2. *Hoover v. State*, 958 A.2d 816, 820 (Del. 2008).

3. *Id.* at 820 (internal quotation marks and

that a person of ordinary intelligence cannot understand the difference between active participation and some other form of participation that would not be unlawful. Similar challenges to gang participation statutes in other jurisdictions all have failed.

In *People v. Castenada*,[4] for example, the California Supreme Court rejected a claim that the term "active participation" in the California Street Terrorism Enforcement and Prevention Act (STEP Act)[5] is unconstitutionally vague. The *Castenada* court relied on dictionary definitions of "active" and "participates," and concluded that "active participation" means "involvement with a criminal street gang that is more than nominal or passive."[6] The court noted, "[t]he distinction between 'active' and 'nominal' membership is well understood in common parlance."[7] Many states modeled their gang participation statutes after the STEP Act, and have rejected similar constitutional challenges.[8]

We agree with the holdings in *Castenada* and the other cited cases, that the term "actively participates" is not unconstitutionally vague. One who "actively partici-

pates in any criminal street gang" performs some role to benefit the gang. Mere association with a street gang, without more, does not constitute forbidden conduct under the statute. The defendant must engage in conduct—do something—with the group. Moreover, even active participation is not a criminal offense without knowledge that the gang has engaged in a pattern of criminal activity, and without knowingly assisting the gang's criminal conduct. Thus, there is no risk that a person would unwittingly commit the crime of forbidden conduct, and, for the same reason, there is no risk of arbitrary enforcement.

■ Taylor also contends that § 616 is unconstitutionally vague because the definition of "pattern of criminal activity" conflicts with the phrase "any criminal conduct." There is nothing vague or confusing about the two phrases because they address two different elements of the crime. First, the person must actively participate in a gang, knowing that the gang has engaged in a "pattern of criminal gang activity." Section 616(a)(2) specifies the limited set of crimes and other circumstances that constitute a pattern of

citation omitted).

4. 23 Cal.4th 743, 97 Cal.Rptr.2d 906, 3 P.3d 278 (2000).

5. Cal. Pen.Code § 186.22

6. *People v. Castenada*, 23 Cal.4th 743, 97 Cal. Rptr.2d 906, 3 P.3d 278, 281 (2000).

7. *Id.* 97 Cal.Rptr.2d 906, 3 P.3d at 285 (*quoting Scales v. United States*, 367 U.S. 203, 223, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961)) (internal quotation marks omitted).

8. *See People v. McGlotten*, 166 P.3d 182, 191 (Colo.App.2007) (construing Colorado Organized Crime Control Act (COCCA), Colo.Rev. Stat. Ann. § 18–17–103(2), to be facially valid despite vagueness challenge to term "enter-

prise"); *In re K.R.S.*, 284 Ga. 853, 672 S.E.2d 622, 624–25 (2009) (construing the Georgia Street Gang Terrorism and Prevention Act, Ga.Code Ann. § 16–16–3(1)(I), to be facially valid despite vagueness and overbroad challenges); *Klein v. State*, 698 N.E.2d 296 (Ind. 1998) (holding amended language in Indiana's criminal gang activity statute, Ind. Code Ann. § 35–45–9–1, as neither unconstitutionally vague or overbroad); *State v. Walker*, 506 N.W.2d 430 (Iowa 1993) (upholding Iowa's gang statute, Iowa Code Ann. §§ 723A.1 et seq., against facial challenge for vagueness); *State v. Mireles*, 619 N.W.2d 558 (Minn.Ct.App.2000) (rejecting overbreadth challenge of Minn.Stat. Ann. § 609.229); *State v. Woodbridge*, 153 Ohio App.3d 121, 791 N.E.2d 1035 (Ohio 7th Dist.2003) (upholding Ohio's criminal gang statute, Ohio Rev.Code Ann. § 2923.42(A)(B), against vagueness challenge).

criminal activity. Second, the person must knowingly promote the gang's involvement in "any criminal conduct" that would constitute a felony. Taylor misreads the statute—there is no conflict.

### Overbreadth Challenge

■ Taylor and Rasin also contend that the gang participation statute is overbroad, because it limits constitutionally protected rights, including freedom of association. A statute is unconstitutionally overbroad if it "does not aim specifically at evils within the allowable area of government control, but sweeps within its ambit other activities that constitute an exercise of protected expressive or associational rights."[9] The overbreadth challenge fails because § 616 does not restrict anyone's right to association. A person cannot be found guilty of forbidden conduct for the sole reason that he or she associates with a gang. The statute requires proof that the person actively participated in the gang, with knowledge of its criminal conduct, and with the intent to further the gang's criminal activities. Freedom of association does not extend to association with a gang for the purpose of assisting in its criminal endeavors.[10]

## II. Taylor's Evidentiary Claims
### Sufficiency of Evidence

■ Taylor argues that his forbidden conduct conviction should be reversed because there was insufficient evidence: 1) that he actively participated as a member of the TrapStars, or 2) that the TrapStars engaged in the commission of the enumerated crimes as one of their primary activities. "When a defendant challenges the sufficiency of the evidence to support a conviction, we review the evidence to determine whether a rational trier of fact, considering the evidence in the light most favorable to the prosecution, could find the essential elements of the offense beyond a reasonable doubt."[11]

■ There was sufficient evidence for a reasonable juror to find that Taylor was an active participant in the TrapStars gang. He sold drugs to Rasin, held guns for the TrapStars, obtained guns for other members, was present during the commission of several violent crimes, and discarded used firearms. Taylor was not a passive observer. He took part in some of the gang's criminal activities, and provided support for others.

■ Taylor's argument that the TrapsStars are a musical group, not a criminal street gang, also fails. There was evidence that the TrapStars sold drugs, stored their drugs, money and weapons at their Traphouse, wrote songs glorifying their criminal behavior, wore hoodies displaying their logo, and engaged in a war with another gang of drug dealers. A group qualifies as a criminal street gang if one of its primary activities is the commission of enumerated crimes. Even if one primary activity of the TrapStars was musical entertainment, a reasonable juror could have found that another primary activity was the commission of various crimes.

### Hearsay Statement

■ Taylor's remaining claim is that the trial court abused its discretion in admitting a hearsay statement about the shooting of Larry Whye. Erica Jenkins

9. *Wien v. State,* 882 A.2d 183, 186–87 (Del. 2005) (Internal quotation marks and citations omitted).

10. *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).

11. *Poon v. State,* 880 A.2d 236, 238 (Del. 2005).

testified that a neighborhood boy, Maleek, ran up to her within five minutes of the shooting and stated "Gunner shot him." (Taylor goes by the name "Gunner.") Maleek did not testify at trial. Taylor argues that the statement is inadmissible hearsay because there was no proof that Maleek observed the shooting or that Maleek is a competent witness. Taylor also contends that there are two men who go by the name "Gunner"—Taylor and Brooks. The fact that Brooks, a member of the Pope's Group is also known as "Gunner" undermined the reliability of the hearsay statement.

■ A statement is hearsay if it is made by someone other than "the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." [12] A hearsay statement is not admissible except as provided by law or the Delaware Rules of Evidence. One exception to the hearsay rule allows the admission of a "present sense impression" statement, defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." [13]

■ To qualify as a present sense impression, the statement must satisfy the following requirements: "[t]he declarant must have personally perceived the event described; the declaration must be an explanation or description of the event, rather than a narration; and the declaration and the event described must be contemporaneous." [14] "Contemporaneous statements do not have to occur at precisely the same moment in time as the triggering event, but must occur shortly thereafter in response to the event." [15] "[I]ndependent corroboration of the statement is not a prerequisite for admission under the present sense impression exception." [16] "[A] challenge to the credibility of the witness who heard the statements goes to the weight to be accorded to that evidence by the jury, not to its admissibility." [17]

The trial court properly admitted Maleek's statement. The record establishes that Maleek was present on the block where Whye was shot, that he saw Ericka within 3–4 minutes of the shooting, and that he told Ericka what happened, including the fact that Gunner shot Whye. Taylor was free to challenge Ericka's credibility and to point out that there are two men called Gunner, but the statement falls within the hearsay exception and was admissible.

## III. Rasin's Claims

Rasin raises four additional claims. He says the trial court abused its discretion by: 1) denying Rasin's motion to sever the gang participation charge; 2) denying Rasin's motion to limit the admission of his prior convictions during the State's case-in-chief; 3) allowing the State to play a TrapStars rap song to the jury; and 4) allowing the State's DNA expert to testify about DNA found on the gun used in the April 30 and May 3 shootings. We find no merit to these claims.

### Severance of the Gang Participation Charge

■ Rasin first argues that the inclusion of the gang participation charge at his

---

**12.** D.R.E. 801(c).

**13.** D.R.E. 803(1).

**14.** *Warren v. State,* 774 A.2d 246, 251 (Del. 2001) (*quoting Abner v. State,* 2000 WL 990973, at ¶ 4 (Del. June 29, 2000) (ORDER)).

**15.** *Green v. St. Francis Hosp., Inc.,* 791 A.2d 731, 736 (Del.2002).

**16.** *Warren v. State,* 774 A.2d at 252.

**17.** *Green v. St. Francis Hosp., Inc.,* 791 A.2d at 736.

trial for murder, attempted murder, and additional felonies was unfairly prejudicial to him because it allowed the State to proffer evidence that portrayed Rasin as a frequent drug dealer. Rasin contends that without the gang participation charge, the State would not have been able to admit prior bad acts evidence during its case-in-chief.

Superior Court Criminal Rule 8(a) provides that "[t]wo or more offenses may be charged in the same indictment . . . if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions together constituting parts of a common scheme or plan."[18] Rule 8(a) "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent with the rights of the accused."[19] If the trial court finds that a joinder of offenses will prejudice either party, it may sever the charged offenses.[20]

 In determining whether the trial court abused its discretion, it is necessary to examine the facts in each case. As a general rule, it may be said that discretion has been abused by denial of a motion to sever when there is a reasonable probability that substantial prejudice may result from a joint trial. The defendant has the burden of demonstrating such prejudice and mere hypothetical prejudice is not sufficient.[21] "[A] defendant is not entitled to a separate trial simply because he might then stand a better chance of being acquitted."[22]

Rasin's argument is premised on the assumption that evidence of his drug dealing would not have been admissible at a separate trial for the first degree murder charge and his two attempted first degree murder charges. That is not a sound premise. The State presented witnesses who portrayed Rasin as a frequent drug dealer between 2008 to 2010, and introduced his prior drug convictions during its case-in-chief. This evidence was relevant to prove the existence of a gang, as well as Rasin's knowing promotion of the TrapStars' criminal purpose. This same evidence also would have been admissible in a separate trial of Rasin's murder, attempted murder, and additional felony charges. Gang motivation and retaliation would have been an important part of the State's case-in-chief to prove Rasin's motive to commit those violent crimes. Otherwise, the crimes would have seemed like random acts of violence. In sum, the evidence supporting the charges in the indictment was "inextricably intertwined" and, therefore, admissible.[23] Because the evidence would have been admitted even if the charges were severed, the trial court acted well within its discretion in denying severance.

### Prior Convictions

 Rasin next claims that the State should not have been allowed to present evidence of his prior convictions during its case-in-chief. Rasin contends that the probative value of admitting his prior convictions was substantially outweighed by

18. Super. Ct.Crim. R. 8(a).

19. *Mayer v. State*, 320 A.2d 713, 717 (Del. 1974).

20. Super. Ct.Crim. R. 14; *see Skinner v. State*, 575 A.2d 1108, 1117 (Del.1990).

21. *Skinner v. State*, 575 A.2d at 1118. (Internal citations omitted).

22. *Bradley v. State*, 559 A.2d 1234, 1241 (Del. 1989).

23. *Younger v. State*, 496 A.2d 546, 550 (Del. 1985) (*quoting McDonald v. State*, 307 A.2d 796, 798 (Del.1973)).

its unfair prejudice, given the seriousness of the charges against him. Ordinarily, prior convictions may be used only to rebut a proffered character trait of truthfulness after the accused has testified.[24] In this case, however, admission of these crimes was necessary to prove the requisite "pattern of criminal activity" under the gang participation statute.[25] The trial court gave a limiting instruction to the jury regarding impermissible character inferences, which the jury is presumed to have understood and applied.[26] We find no abuse of discretion.

### TrapStars Rap Song

■ Rasin argues that the trial court abused its discretion in allowing a TrapStars rap video, performed by Mills, to be played for the jury. Rasin claims this is reversible error because the probative value of this evidence was substantially outweighed by its unfair prejudice. Rasin contends that the song depicted the TrapStars as "drug-dealing, gun-toting thugs" and caused the jury to convict Rasin for the 2010 felonies based on impermissible character and propensity evidence.[27]

■ "The determination of whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter which falls particularly within the discretion of the trial court, which has the firsthand opportunity to evaluate relevant factors."[28] Such rulings will be upheld on appeal unless "it is shown that a ruling

was a clear abuse of discretion or that it affected the substantial rights of the defendant."[29]

The lyrics to the TrapStars rap song played for the jury generally discuss drug dealing and violent acts, while also containing statements that specifically reference the animosity between the TrapStars and Pope's Group and the crimes and violence at issue in the instant case. Thus, the song helped establish the fact that the TrapStars are a criminal street gang. The trial court admitted the rap song under the co-conspirator exception to the hearsay rule, as the song had been performed by co-defendant Mills. In addition, the trial court analyzed the rap video under the six-part *Getz* test,[30] and concluded that the rap song was not being admitted for an improper purpose. The trial court did not abuse its discretion.

### DNA Expert Testimony

■ Rasin argues that the trial court should not have allowed the State's DNA lab expert to testify about the DNA found on the gun used in the April 30 and May 3 shootings. The State sent DNA samples from the gun to NMS Labs for testing against the DNA profiles of Rasin, Taylor, Valentine, Fayson, and Ortiz. Katherine Cross, an NMS Labs forensic biologist, testified about the NMS Labs Report. Cross stated that the test result for Rasin's profile was "could not be excluded," which means less than a full DNA profile was detected and that it was theoretically

24. See: DRE 609.

25. *See* 11 *Del. C.* § 616(a)(2).

26. *See Burton v. State*, 149 A.2d 337, 340 (Del.1959).

27. Rasin Opening Brief, p. 19.

28. *Williams v. State*, 494 A.2d 1237, 1241 (Del.1985).

29. *Ciccaglione v. State*, 474 A.2d 126, 130 (Del.1984) (*quoting United States v. Golden*, 671 F.2d 369, 371 (10th Cir.1982)) (internal quotation marks omitted).

30. *See Getz v. State*, 538 A.2d 726 (Del.1988).

possible that Rasin had never touched the gun or that it was not Rasin's DNA. She also testified that Rasin, or anyone in his paternal family line, could be a contributor to the sample, and that it was possible that his DNA coincidentally aligned with the DNA found on the gun. When asked to provide the statistical significance of the "could not be excluded" test result, Cross testified that no statistical number could be provided and that theoretically the entire American male population could be a DNA contributor. Cross also could not say with any scientific certainty that Rasin's DNA was on the gun.

The trial court did not abuse its discretion in admitting the DNA test results. First, the test results established that four different people handled the gun. That information supports the evidence that the TrapStars shared weapons, and helped establish that the gang consisted of three or more people. Second, the fact that Rasin could not be excluded had some probative value because other suspects were excluded, and Rasin was not. That fact supported the other, independent evidence that Rasin was the perpetrator.

## CONCLUSION

Based on the foregoing, the judgments of the Superior Court are affirmed.